Filed 1/8/26  Ramsey v. Moore St Investments CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| AARON RAMSEY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MOORE ST INVESTMENTS, INC., et al.,<br><br>     Defendants and Appellants. | D084287<br>D085104<br><br><br>(Super. Ct. No.:<br>37-2002-00022321-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed in part and reversed in part.

DPA Attorneys at Law, Pooja Mehta, and E. Daniel Robinson, for Appellant Moore St Investments, Inc.

Stephen F. Lopez APC and Stephen F. Lopez, for Appellant Advantage Towing Company, Inc.

Golden & Cardona-Loya and Jeremy S. Golden, for Respondent.

On two occasions during 2022, Advantage Towing Company, Inc. (Advantage) towed Aaron Ramsey's car from a parking lot owned by his landlord, Moore St Investments, Inc. (Moore).  Ramsey responded by suing Moore and Advantage.  Following a two-day bench trial, the court entered judgment against Moore and Advantage and denied Ramsey's motion for an award of attorneys' fees.

Moore and Advantage (collectively, defendants) appeal the judgment, contending the trial court erred in determining statutory liability, tort liability, and damages; and Ramsey appeals the denial of his motion for attorneys' fees. We agree with some but not all of the defendants' arguments. On this basis, we reverse the judgment in part as to Moore and in part as to Advantage. In all other respects we affirm the judgment and the denial of Ramsey's motion for an award of attorneys' fees.

## I.   BACKGROUND

To supply context for this appeal, we begin with a brief introduction to certain aspects of a trio of statutory provisions—Vehicle Code Section 22658 and Civil Code sections 3068.1 and 3070—that regulate towing of vehicles from private property at the property owner's behest.[1]

### A.   Vehicle Code Section 22658, Subdivisions (a) and (*l*)

Section 22658, subdivision (a), sets forth circumstances under which a private property owner (such as Moore) may cause a vehicle to be towed from its property. One such circumstance pertains to the adequacy of tow-related signage on the property. (*Id.,* subd. (a)(1).) A second pertains to the duration of notice provided before a tow. (*Id.,* subd. (a)(2).) A third pertains to the condition of the vehicle. (*Id.,* subd. (a)(3).) Specifically:

> "(a)  The owner or person in lawful possession of private property . . . may cause the removal of a vehicle parked on the property . . . under any of the following circumstances:
>
> > "(1)  There is displayed, in plain view at all entrances to the property, a sign not less than 17 inches by 22 inches in size, with lettering not less than one inch in height, prohibiting public parking and indicating that vehicles will be removed at the owner's expense, and containing

---

[1]     All references to section 22658 are to the Vehicle Code, and all references to sections 3068.1 or 3070 are to the Civil Code.

2

the telephone number of the local traffic law enforcement agency and the name and telephone number of each towing company that is a party to a written general towing authorization agreement with the owner or person in lawful possession of the property . . . .

"(2)  The vehicle has been issued a notice of parking violation, and 96 hours have elapsed since the issuance of that notice.

"(3)  The vehicle is on private property and lacks . . . any . . . major part or equipment necessary to operate safely on the highways, the owner or person in lawful possession of the private property has notified the local traffic law enforcement agency, and 24 hours have elapsed since that notification."  (§ 22658, subd. (a)(1)-(3).)

Not all of these circumstances must be present in order for a property owner to be justified in authorizing a tow based on subdivision (a).  Rather, as indicated in the subdivision's introductory clause, the property owner may cause a tow under "*any* of [these] . . . circumstances."  (§ 22658, subd. (a), italics added].)

Another subdivision of section 22658—subdivision (f)—imposes a post-tow obligation that is similar in some respects to that set forth in subdivision (a)(3), albeit irrespective of the condition of the vehicle.  This subdivision states that:  "An owner or person in lawful possession of private property . . . causing the removal of a vehicle parked on that property shall notify by telephone or, if impractical, by the most expeditious means available, the local traffic law enforcement agency within one hour after authorizing the tow."  (§ 22658, subd. (f).)

Whereas the passages quoted above govern conduct of property owners, other passages of section 22658 govern conduct of towing companies (such as Advantage).  Among such passages are subparagraphs (A) and (B) of

3

subdivision (*l*)(1), and subdivision (*l*)(5). The first of these three requires a towing company to receive written authorization from the property owner before commencing a tow, the second specifies the required contents of such written notice, and the third imposes a penalty for noncompliance. Subparagraphs (A) and (B) of section 22658, subdivision (*l*)(1) provide:

> "(A) A towing company shall not remove or commence the removal of a vehicle from private property without first obtaining the written authorization from the property owner or lessee . . . , or an employee or agent thereof, who shall be present [on the private property] at the time of removal and verify the alleged violation . . . .

> "(B) The written authorization under subparagraph (A) shall include . . . : [¶ . . .¶] (ii) [t]he name, signature, job title, residential or business address, and working telephone number of the person, described in subparagraph (A), authorizing the removal of the vehicle; (iii) [t]he grounds for the removal of the vehicle; (iv) [t]he time when the vehicle was first observed parked at the private property; [and] (v) [t]he time that authorization to tow the vehicle was given."

Section 22658, subdivision (*l*)(5) provides:

> "(*l*)(5) A person who violates this subdivision is civilly liable to the owner of the vehicle or their agent for four times the amount of the towing and storage charges."

As will be seen *post*, the trial court premised a significant portion of its judgment in this case on determinations that Moore had violated section 22658, subdivisions (a) and (f), and that Advantage had violated subdivision (*l*).

**B.    Civil Code Section 3068.1, Subdivision (a)(1)**

Section 3068.1, subdivision (a)(1) sets forth circumstances in which a person may acquire a lien in the context of a tow. It provides that:

4

"Every person has a lien dependent upon possession for the compensation to which the person is legally entitled for towing, storage, or labor associated with recovery . . . of any vehicle subject to registration that has been authorized to be removed by . . . a private property owner pursuant to Section 22658 of the Vehicle Code."

## C.    Section 3070, Subdivision (d)

Section 3070, which appears in the same chapter as section 3068.1, articulates consequences attendant to certain types of misconduct associated with liens acquired by operation of section 3068.1.  Thus, for example, the first of section 3070's four subdivisions, subdivision (a), speaks to consequences in situations in which "the possessory lien upon [a] vehicle is lost through trick, fraud, or device."  Subdivision (b) makes it "a misdemeanor for any person to obtain possession of any vehicle . . . subject to a lien pursuant to this chapter by trick, fraud, or device."  Subdivision (c) makes it "a misdemeanor for any person claiming a lien on a vehicle to knowingly violate this chapter."  And subdivision (d) speaks to consequences in situations in which a person either "improperly causes a vehicle to be towed or removed in order to create or acquire a lienhold interest enforceable under this chapter" or "violates subdivision (c)."

According to the terms of paragraphs (1) and (2) of subdivision (d):

"1.  Any person who *improperly causes a vehicle to be towed or removed in order to create or acquire a lienhold interest* enforceable under this chapter . . . *shall be liable to the owner or lessee of the vehicle for the cost of removal, transportation, and storage . . .* [and] *attorneys' fees.*

"2.  For purposes of this subdivision, 'improperly causes a vehicle to be towed or removed' *includes*, but is not limited to, engaging in any of the following acts, the consequence of which is the towing or removal of a vehicle:  [¶] (C) *Failure to comply with Section 22658* of

5

the Vehicle Code." (Civ. Code § 3070, subd. (d), italics added.)

As can be seen, section 3070 does not apply to just *any* tow. Rather, its applicability turns on the presence of:

– "trick, fraud, or device" (subds. (a) and (b));

– a "knowing[] violat[ion]" of the chapter (subd. (c)); or

– impropriety—e.g., in the form of a tow that fails to comply with Vehicle Code section 22658—coupled with an intention "to create or acquire a lienhold interest." (Civ. Code § 3070, subd. (d).)

As will be seen *post,* in its statement of decision, the court relied on section 3070 (without specifying an applicable subdivision) in awarding Ramsey (1) damages equal to the towing and storage fees he paid to Advantage to regain possession of the car following the first tow and (2) attorneys' fees. As will also be seen, *after* entry of judgment, the trial court reversed course with respect to the second of these two forms of relief and decided not to award attorneys' fees under section 3070.

With Vehicle Code section 22658 and Civil Code sections 3068.1 and 3070 in mind we now examine the circumstances that led Ramsey to initiate this lawsuit and that rendered these sections relevant here.

**D.    Ramsey, Moore, Advantage, and the Circumstances that Led to the Initiation of this Lawsuit**

Starting in 2019, Ramsey resided as a tenant at Moore Place, a 31-unit apartment complex that Moore owned in the Old Town neighborhood of San Diego. Ramsey routinely parked his car in space number 8 of the Moore Place parking lot. But, on two occasions 30 days apart during 2022, Ramsey's car was towed from that spot by Advantage at the behest of Moore.

The first tow occurred on February 10, during a period of time in which Ramsey was out of town. It resulted in the car being impounded by

6

Advantage for 14 days and in Ramsey making payments totaling $1,635.70 to Advantage in order to regain possession of the car and of personal belongings he had stored in it.

The second tow occurred on March 12, when Ramsey was present at Moore Place. This tow resulted in the car being sold in a lien sale auction to Advantage.

After the second tow, Ramsey initiated this lawsuit with the filing of a complaint in which he alleged that Moore and Advantage were liable to him for failing to comply with various subdivisions of section 22658 and for the torts of conversion, trespass to chattels, and nuisance.[2] Among the forms of relief Ramsey sought in the complaint were statutory damages,[3] tort damages, and attorneys' fees and costs.

### E. Evidence at Trial

At trial the court heard testimony from Ramsey and from three defense witnesses. Two of these witnesses—Jesus Elizarraras and Jesse Santana—were employees of Advantage. The fourth witness—Victoria Baker—was a supervisor with Hotel Investment Group (HIG), the company that managed Moore Place for Moore.

---

[2]    Ramsey also alleged the defendants had violated Business & Professions Code section 17200; however, this theory of action appears to have been abandoned before trial.

[3]    For convenience, we use the term damages to refer to awards authorized under these cited sections of the Vehicle Code and Civil Code. This usage should not be interpreted as a holding that such awards should properly be characterized as damages rather than penalties. How such awards should be characterized is not an issue that the parties have presented on appeal.

As trial was beginning, Moore also sought leave for another of HIG's former employees—Dena Mottola—to testify remotely. According to Moore's counsel:

> "Mottola used to be the manager of [Moore Place]. [S]he was the one responsible for things like leases and determining who gets to park where and determining when to tow people. She was present for both of the towings, and she communicated with Mr. Ramsey extensively via e-mail."

According to Advantage's counsel, Mottola was "the key witness in th[e] case." But Ramsey's counsel objected on procedural grounds to Mottola testifying remotely, the court sustained the objection, and Mottola did not testify.

### 1. Undisputed Evidence

Much of the evidence introduced at trial was undisputed. Thus, for example, no one disputed evidence that Ramsey rented Moore Place apartment number 214 during 2019, 2020, 2021, and 2022; that Advantage towed Ramsey's car at the behest of HIG on February 10 and March 12, 2022; that the first tow occurred less than the statutorily required 96 hours after a tow notice had been affixed to Ramsey's car; that Ramsey made the payments to Advantage discussed *ante*, for towing and storage fees, in order to regain possession of the car and its contents following the first tow; that Ramsey did not regain possession of the car after the second tow; that Advantage acquired title to the car at auction as described *ante*; and that the car was worth $6,000.

Also undisputed was testimony by Ramsey, and e-mail correspondence in support of such testimony, to the effect that, during the months leading up to the tows, he had been grappling with challenging circumstances that included the COVID pandemic's devastation of his business; a resulting inability to keep current with rent owed to Moore; a need to deal with

8

eviction proceedings HIG had initiated against him; and a need to care for his mother after a surgery that necessitated his presence in northern California over the course of several months—including at the time of the first tow.

### 2. Disputed Evidence

Although much of the evidence was undisputed, not all of it was. Among the topics as to which contradictory evidence was presented were whether, when, and under what conditions, Ramsey had a right to park his car in space number 8 and in the Moore Place parking lot in general; the duration of the notice Ramsey was provided before the second tow; the circumstances surrounding the tow authorizations; the status of the car's DMV registration over time; and the condition of the car at the time of each tow.

### a. Evidence Regarding Whether, Under What Circumstances, and Where Ramsey was Entitled to Park

Regarding whether, when, and under what conditions Ramsey had a right to park his car in space number 8 and in the Moore Place parking lot in general), Ramsey introduced his lease to unit 214. The lease was dated April 1, 2019, bore Ramsey's electronic signature, and was configured as a standardized rental agreement form coupled with a "Variable Lease Term section" that included a number of tenant-specific fields to be filled in.

Among the standardized terms in the lease was a clause titled "Parking/ Garage/Vehicles," which stated:

> "If parking spaces or garages are assigned, you may park on the Property only in the garage or parking space(s) specified in the Variable Lease Term section. . . . If specified in the Variable Lease Term Section, monthly Garage/Parking Rent is charged for this privilege."

Among the fields to be filled in on the Variable Lease Term section were the following three line items:

9

"Base Rent: _____

"☐ (*If checked*) License For Garage/Parking Space No.: ____

"Monthly Garage/Parking Rent:  $_____"

A base rent amount appeared in the first of these three fields.  But the license-to-park box was not checked, and the fields for a parking space number and for a parking rent amount were not filled in.

The Parking/Garage/Vehicles clause also included a statement that:

"A vehicle may be towed if it:  (A) has flat tires or other condition rendering it inoperable; . . .  (C) has no current license or no current license sticker; . . . (L) cannot lawfully be operated as a vehicle on the road; . . . or (O) any other reason allowed by law."

Ramsey testified that, in 2019, HIG e-mailed him a diagram of the Moore Place parking lot indicating that space number 8 was assigned to his unit, number 214.  He further testified that, in 2020, HIG sent him an e-mail saying "we will be replacing the current parking placard with a parking decal that can be applied to the front window of your vehicle;" that he was then provided with a decal saying "official parking pass" and "spot number M8;" that he affixed the decal to his windshield; and that he "always" parked his car in space number 8.

In addition, Ramsey presented e-mail correspondence between himself and Mottola, from October and November 2021, in which Mottola introduced herself as the new property manager, told Ramsey "I have a parking pass for you once you return," asked him to move his car because its tires were flat and the registration had lapsed, and transmitted a three-day notice to pay or

10

quit (in other words, an eviction notice).[4] This correspondence included the following exchange from November 16:

> "[Ramsey:] Dena, ¶ Please understand my position. I spent many, many hours and almost $200 coordinating from 400 miles away with a friend and vehicle storage company to get my car moved yesterday at your request. It was very frustrating that my key card that I gave to the friend was deactivated, and that there was no help or assistance from HIG. I tried calling, emailing, and texting. . . . [¶] I don't have the capability of . . . coordinating getting the car keys out of my apartment while my key card doesn't not [*sic*] work, and I am 400 miles away. I will be home no later than December 16th and will get new key cards and move my car then. I assure you my car is not abandoned, and I have all paperwork including registration and insurance if needed.

> "[Mottola:] Aaron, [¶] I'm very sorry, but we cannot give anyone that's not listed on the lease agreement a key or access to remove items from the unit. . . . If you'd like to authorize anyone entry to your unit that is not listed on the lease agreement, we do need a notarized letter stating you give permission for Hotel Investment Group (HIG) to give a key to your unit . . . . The car has been sitting on flat tires for some time now and is out of current registration. We were under the impression that you'd be returning to your home last week and waited for your return. We've received several complaints about the car being an abandoned vehicle. We understand it's not, however it needs to be brought to a working condition to stay on the property."

As can be seen from this correspondence, as of November 16, Mottola was asking Ramsey to move the car due to its physical condition and registration status, not for any other reason; and she was not threatening a

---

[4] During the trial Ramsey articulated a theme that the tows were part of a campaign by Moore and or HIG to evict him in furtherance of a plan to convert Moore Place from a long-term residential apartment complex into a short-term vacation rental business.

tow.  According to Ramsey, testifying in response to a question about communications during 2021:

> "We were going back and forth and I was never told specifically that it was do or die, move your car or it gets towed . . . [¶ . . . ¶]  The e-mail chain kept going and we were trying to work it out."

But, between November 2021 and February 2022, the circumstances appear to have shifted.  So much so in fact that (in response to a question about the second tow) Ramsey testified that, beginning nine days before the *first* tow, the threat of being towed became "constant":

> "Q.  You did know that there was a threat at [the] time [of the second tow] that the vehicle would be towed?
>
> "A.  There was always a threat from February 1st on there. There was [a] constant threat of being towed."

Precisely how or when Ramsey first came to perceive this threat is not disclosed in the record.  But some light may be shed by the testimony of Mottola's supervisor, Baker.  Baker testified that the assignment of a parking space to Ramsey "may have been a mistake" and that, not long after Mottola had commenced managing Moore Place, the mistake had been discovered and the assignment of a parking space to Ramsey had been revoked.

Baker testified that she had informed Ramsey of the mistake and of the fact that the assignment of a parking space to him was being revoked.  She also testified that, in response, Ramsey had agreed to move his car (although he needed more time to do so).  Yet Ramsey continued to park in space number 8 even after this conversation with Baker and even after February 1, when the threat that his car would be towed became constant.  (See *ante.*)

On February 10, the first tow ensued.  In an exchange of e-mails between Ramsey and Mottola eight days later, there appears the first

indication *in writing* that the assignment of a parking space to Ramsey had been revoked:

> "[Ramsey:]  My car is missing, can someone please tell me where it is?
>
> "[Mottola:]  Aaron, [¶] Parking warnings were placed on any cars parked unauthorized, nonoperational, and or not currently tagged.  All notices placed on cars were given 24 hours, but we gave 48 hours.  The car was nonoperational, out of date with registration, and tires were just about flat with cobwebs.  The space was never assigned to you as you have never signed to this additional rental fee nor paid for this space.  There is not a signed parking addendum in your file.  This car was never to be parked there or ever assigned to you.  A parking pass was never provided to you for you to park onsite.  The tow company information is posted at the property in several locations.  They will be able to help you with your car location."

### b.    Evidence Regarding Duration of Notice Provided Before the Second Tow

Turning to another topic as to which the trial court received conflicting evidence—the duration of the notice Ramsey was provided before the second tow—Ramsey testified during his direct examination that the second tow occurred on March 12 and that he received two handwritten tow notices before that tow:  one "from management" that was pinned under the car's windshield wiper "around March 9th," and the other from an unidentified source that he believed was placed there on March 11.  But, on cross-examination, he conceded "I could be days off" with regard to the earlier of these two notices; and, in deposition testimony that was read into the record, he estimated that he had seen the earlier of those two notices on his windshield "several days to a week" before he saw the later one there.  In other words, Ramsey conceded the second tow notice could very well have

13

been pinned to his car's windshield more than 96 hours before the second tow.

### c. Evidence Regarding Tow Authorizations

Regarding the tow authorizations, three standardized tow authorization forms printed on Advantage letterhead were introduced in evidence. The first such tow authorization form corresponded to the first tow, and was partially completed. Among the fields filled in on this form was a field for the name of the property owner, or property owner's agent, authorizing the tow. The name written in this field was Dena Mottola. But some of the fields on this tow authorization form were left blank, including the fields for the signature and job title of the property owner or its authorized agent and the grounds for removal of the car.

The second and third tow authorization forms corresponded to the second tow. One of these two forms identified the tow driver as "Mike," the tow duration as 11:15-11:45, and the property owner or its agent authorizing the tow as Dena Mottola. This form also included what purported to be Mottola's signature. The other form identified the tow driver as "Alex," and listed the tow duration as 11:45-12:05. The form was redacted such that no name appeared as the property owner or agent authorizing the tow. In addition to these discrepancies, the two authorization forms for the second tow further contradicted one another insofar as certain of the information entered in each form's field for the condition of the car.

Baker testified that she specifically recalled Mottola saying, as she was leaving the office on one occasion, that she was going to meet with a driver who was coming to tow Ramsey's car. But no witness was able to verify the authenticity of Mottola's signature on the two forms that bore her name as the owner/authorized agent, and no witness could say for sure when the forms had been filled in or whether Mottola had been present at Moore Place

14

when either of the tows occurred. As for the discrepancies between the two authorization forms for the second tow, Elizarrara testified: that "Mike was not the actual tow truck driver for the second tow"; that sometimes, when a driver does not turn in the authorization form quickly enough, an employee other than the driver fills out the form for them after the fact; that this might help explain the existence of a second form for the second tow; and that, of the two forms for that tow, the one identifying "Alex" as the driver was "the right tow authorization form."

### d.     Evidence Regarding DMV Registration

Regarding the status of his car's DMV registration over time, Ramsey testified on cross-examination in a manner that was inconsistent and ambiguous. Thus, for example, he acknowledged at one point during the cross-examination that, at the time of the tows, the car had been unregistered for more than two years. At other points during the cross-examination, he testified that he had acquired "a temporary registration" that permitted him to drive legally for a portion of that timeframe. But his testimony about the temporary registration indicated that the permit had expired prior to the first tow. Ramsey testified that he also had obtained one or more "moving permits" that would have been good for one day. However, he testified that he had retained no records of any temporary registration or moving permit(s).

### e.     Evidence Regarding Condition of Car

Regarding the condition of the car, Elizarraras testified that, at the time of the first tow, the car "was inoperable" "because according to Mr. Ramsey, he had lost the keys, the vehicle needed mechanical work, and that's why he had not registered it since 2018." In addition, Elizarraras testified that "that there was a tire that was kind of low in the front" at the time of the

first tow. But he acknowledged that, in a picture of the car taken at the time of the second tow, he did not see any flat tires.

In deposition testimony played by Moore's counsel, Ramsey acknowledged that "there were times when the tire pressure was very low" such that "you [could] drive" the car but "it wouldn't be smart." But he also testified that, at the time of each tow, the car was operable and had no flat tires. In addition Ramsey testified that, after paying the towing and storage fees to regain possession of the car after the first tow, he drove the car home from the tow yard, as is, without having to perform any maintenance on it.

### f.      Evidence Regarding Consequences of Tows

Regarding consequences of the tows, Ramsey testified to having made at least three separate trips to Advantage to gather information and to retrieve the car and its contents, and to having experienced frustration in dealing with Advantage—especially with regard to the methods of payment it would accept—in connection with each tow. Specifically, Ramsey testified that Advantage declined to accept the credit card he tendered because it did not have a chip. In addition, he testified that he devoted about 80 hours toward trying to regain possession of the car, that he ended up having to borrow money from a family member in order to raise the $1,635.70 he needed to regain possession of his car and its contents from Advantage, that he did not have access to another car he could use in the interim, and that, as a result, he ended up spending approximately $2,000 on rental cars and $3,000 on ridesharing services.

Finally, Ramsey also testified to the toll that the tows had taken on his mental health:

> "Q. Can you describe if you had any stress related to the towing of your vehicle?
>
> "A. I definitely did.

16

"Q. Okay. And can you describe that?

"A. It was probably the most stressful part of my life, dealing with COVID, dealing with mom's health issues, dealing with being evicted by Moore Street, then dealing with them towing my car. Yeah, it was probably the most stress I've ever dealt with.

"Q. So just focusing on the towing, can you talk about how the towing affected your mental health?

"A. Yeah. It greatly affected my overall health. I lost a lot of sleep. I spent a lot of time trying to deal with it and get the situation fixed. I wasn't eating enough. I wasn't getting exercise. It was hard to get around. You know, I couldn't drive to the gym. I couldn't go to the grocery store. So yeah, as far as stress and health, it greatly affected me.

"Q. And other than loss of sleep, loss of appetite, any other symptoms related to the stress just from the towing?

"A. Sleep, appetite. During that period is the first time in my life I've ever had high blood pressure. [¶ . . . ¶]

"Q. How would you rate the stress just in regards to the towing on a scale of 1 to 10?

"A. I would say an 8."

## F. Statement of Decision

During closing arguments, the trial court expressed views as to various aspects of the evidence. Thus, for example, it rejected the defense's claim that the car had been inoperable at the time of each tow, it expressed "some reservations about Mr. Ramsey's testimony that he got [a] same-day or single-day registration to allow him to drive," and it expressed skepticism about Baker's testimony that Ramsey's parking privileges had been revoked:

"Court: On the issue of plaintiff's right, if any, to continue parking in space number 8, I realize the lease is silent on whether Mr. Ramsey purchased a parking space as part of his rent. On the other hand, . . . and I think Ms. Baker

17

acknowledged this . . . [HIG] explicitly gave or acknowledged Mr. Ramsey's right to park in space 8 and he did so for three years or more until things seemed to have come to a head in the spring or late winter of 2022 when he wasn't paying his rent and your client was going through a transition in the nature of its tenants. [¶ . . . ¶]

"Court: This seems to be several years' worth of . . . allowing Mr. Ramsey to park where he had been parking, and you want to undo that . . . [¶] in 2022? [¶] How do you reconcile [the communications between Ramsey and HIG] with your argument that Mr. Ramsey was not entitled to park in space 8 and in particular, the graph[5] . . . ?

"[Counsel]: [A]s Ms. Baker explained, this was a mistake and . . . she communicated . . . with Mr. Ramsey by phone and also communicated by e-mail[6] that it was a mistake and he said, all right, I'll move my car. So—

"Court: And you think that's enough to have avoided his right to continue parking in space 8 . . . ?"

Thereafter, the trial court issued a statement of decision in which it made determinations in favor of Ramsey as to some subdivisions of section

---

[5] This appears to be a reference to the diagram of the Moore parking lot indicating that space number 8 was assigned to unit number 214. (See *ante.*)

[6] We have not found such an e-mail from Baker in the record on appeal.

22658, and in favor of the defendants as to other of that section's subdivisions.[7]

Among the findings against Moore were: (i) "that the signage at [Moore Place] did not comply with [section 22658, subdivision] (a)(1)," (ii) that Moore's "notice [to Ramsey] prior to the first tow[8] . . . did not comply with [subdivision] (a)(2);" (iii) that neither tow complied with subdivisions (a)(3) and (f) because Ramsey's "car could be operated safely on the highways; and (iv) that Moore did not comply with subdivision (a)(3) or subdivision (f) because Moore "did not notify law enforcement as required" by those subdivisions.

Among the statement of decision's findings against *Advantage* was that Advantage had not complied with section 22658, subdivision (*l*)(1)(A) (which, as discussed *ante*, requires a towing company to received written

---

[7] Among findings the trial court made in favor of the defendants were: (i) a finding that Moore had not failed to comply with subdivision (*l*)(1)(A) of section 22658 (which applies to towing companies, not to property owners); (ii) a finding that Advantage had not failed to comply with subdivisions (k)(1) or (k)(2) of that section (which apply to a towing company's acceptance of credit cards) or subdivisions (a)(2) or (c)(1) of a related provision of the Vehicle Code, section 22651.07 (which pertain to notice requirements applicable to towing companies); and (iii) a finding that, Advantage *had* failed to comply with subdivision (n)(3) of section 22658 (which requires a tow facility to have a pay phone), but that Ramsey had suffered no harm as a result.

[8] It appears the trial court found (i) that the first tow occurred within less than the statutorily required 96 hours (see § 22658, subd. (1)(a)(2)) after a notice of parking violation had been affixed to Ramsey's car, but (ii) that the second tow did not occur until after the statutorily required waiting period had elapsed.

19

authorization from the property owner before commencing a tow).[9] Whereas the statement of decision distinguished between the first tow and the second tow in articulating its conclusion that Moore had failed to comply with subdivision (a)(2) ("Moore's notice *prior to the first tow* . . . did not comply with (a)(2)"; see *ante*, italics added), it made no such distinction between tows in articulating its conclusion that Advantage had failed to comply with subdivision (*l*)(1)(A).

The statement of decision also found that each of the defendants was liable to Ramsey for all three of the torts he had alleged in his complaint—i.e., conversion, trespass to chattels, and negligence.

In addition, the statement of decision addressed the categories of relief for which Ramsey had prayed in the complaint, as follows:

> "Vehicle Code violations:  Plaintiff is awarded the towing and storage fees of $1,635.70 plus attorneys' fees and costs, pursuant to Civil Code 3070, as determined in a post-trial motion and a memorandum of costs, against both Defendants.  Plaintiff is awarded a civil penalty of four times the amount of the towing and storage charges or the amount of $6,542.80 against Defendant Moore only.  Vehicle Code 22658(*l*)(5).

> "Conversion, Trespass to Chattels and Negligence:  Plaintiff is awarded economic damages of $6,000 for the value of his Smart car and towing and storage fees of $1,635.70 plus noneconomic damages for his emotional distress, inconvenience, anxiety and humiliation of $45,000, against both Defendants.

> "Plaintiff did not carry his burden . . . [regarding] punitive damages."

---

[9] The trial court also found Advantage did not comply with subdivisions (b), (*l*)(1)(C)(3), and (m)(1) of section 22658.

20

Each defendant filed objections to the statement of decision; however, the court overruled the objections, and the statement of decision became final.

## G. Judgment

After the statement of decision became final, Ramsey circulated a proposed form of judgment that repeated, nearly verbatim, the first two paragraphs quoted *ante* from the statement of decision's discussion of relief, and then tallied the items listed in those paragraphs to arrive at a pair of awards totaling: (1) $60,814.20 plus amounts to be determined for attorneys' fees and costs as against Moore; and (2) $54,271.40 plus amounts to be determined for attorneys' fees and costs as against Advantage. Summarized here in a table (Table 1), these tallies are as follows:

TABLE 1

|  |  | Moore | Advantage |
|---|---|---|---|
| **A** | Towing and storage fees, per § 3070, subd. (d) | $1,635.70 | $1,635.70 |
| **B** | Four times towing and storage fees, per § 22658, subd. (*l*)(5) | $6,542.80 | $0.00 |
| **C** | Economic tort damages: towing and storage fees | $1,635.70 | $1,635.70 |
|  | Economic tort damages: value of car | $6,000.00 | $6,000.00 |
|  | Noneconomic tort damages: emotional distress, inconvenience, anxiety, humiliation | $45,000.00 | $45,000.00 |
| **D** | Attorneys' fees and costs, per § 3070 | [TBD] | [TBD] |
|  | Totals | $60,814.20 | $54,271.40 |
|  | Aggregate Recovery | $115,085.60 + Attorneys' Fees TBD | |

Moore objected to the proposed judgment, contending that its tally impermissibly yielded a double recovery by awarding *severally* components of

21

relief that it contended should instead have been awarded *jointly* and severally; and Advantage stated it had "[n]o objection to the form of the judgment." Thereafter, the trial court entered judgment using the form Ramsey had proposed, with no changes.

Moore and Advantage then timely appealed the judgment.

## H.    Attorneys' Fees

After Moore and Advantage filed their notices of appeal from the judgment, Ramsey filed a motion seeking an award of $84,098 in attorneys' fees. Each defendant opposed the motion. And, notwithstanding the statement in the judgment that "Plaintiff is awarded . . . attorneys' fees . . . , pursuant to Civil Code 3070, . . . against both Defendants"—the trial court ruled that Ramsey was entitled to *no* award of fees. In the words of the court:

> "[T]he record does not support the ability to award attorney fees, pursuant to Civil Code section 3070(d), and the [m]otion is denied on this basis. [¶ . . . ¶]
>
> "The record contains evidence and findings that improper towing occurred. However, there is no evidence or findings that the improper towing was accomplished 'in order to create or acquire a lienhold interest.' Further, there is no evidence or findings that either [d]efendant, when claiming a lien, 'knowingly violate[ed]' Chapter 6.5, 'Liens on Vehicles.' "

## II.    DISCUSSION

Moore and Advantage contend the trial court erred in determining statutory liability, tort liability, and damages. Ramsey contends the court erred in denying the motion for an award of attorneys' fees. We discuss these contentions *post* in a sequence that tracks the four principal line items set forth in Table 1, organized under the following four headings:

> A. Award of Towing and Storage Fees, Pursuant to Civil Code Section 3070, Subdivision (d)

22

B. Award of Four Times Towing and Storage Fees, Pursuant to Vehicle Code Section 22658, Subdivision (*l*)(5)

C. Awards of Tort Damages

D. Attorneys' Fees

So doing, we apply two standards of review.

For conclusions of law, we apply the de novo, or independent, standard of review. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*) ["In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo."].)

For findings of fact, we apply the substantial evidence standard. (*Thompson, supra,* 6 Cal.App.5th at p. 981.) "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. [Citation.] Under this standard of review, parties challenging a trial court's factfinding bear an ' "enormous burden." ' " (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*).)

"If substantial evidence supports factual findings, those findings must not be disturbed on appeal. [Citation.] Inferences favorable to appellants may create conflicts in the evidence, but that is of no consequence. [Citation.] When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Schmidt, supra*, 44 Cal.App.5th at p. 582; see also *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 (*Bowers*) ["If

such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (Italics omitted)].)

Consequently, "[t]he testimony of a single credible witness—even if a party to the action—may constitute 'substantial evidence.' " (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2025) ¶ 8:52, p. 26; accord *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [" 'The testimony of a witness, even the party himself, may be sufficient.' "].) " '[W]hen there is substantial evidence in support of the trial court's decision, the reviewing court has *no power to substitute its deductions*.' " (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429, fn. 5.)

Additionally, it is the role of *the trial court*—not the Court of Appeal— to make credibility determinations (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177); and (other than perhaps in extraordinary circumstances) those determinations are *conclusive* on appeal. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94 [" '[w]e . . . are bound by the trial court's credibility determinations' "]; *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162 [" '[i]t is not our role as a reviewing court to . . . assess witness credibility' "].)

## A. Award of Towing and Storage Fees, Pursuant to Civil Code Section 3070, Subdivision (d)[10]

The judgment awarded Ramsey $1,635.70 against Moore, plus the same amount against Advantage, for towing and storage fees, and it did so "pursuant to section 3070." (*See* Table 1 *ante*, line item A.) As a

---

[10] Our discussion of section 3070, subdivision (d)(1), here is focused on the language in that subdivision that imposes liability "for the cost of removal, transportation, and storage." Later in this opinion we address the language in that subdivision that imposes liability for "attorneys' fees."

24

consequence, we are presented with the issue of whether section 3070 is applicable to the circumstances presented in this case.[11]

In addressing this question, the parties focus exclusively on the language in subdivision (d) of section 3070 (see *ante*) that imposes liability on any person who "fail[s] to comply with [s]ection 22658" "in order to create or acquire a lienhold interest enforceable under this chapter." (Civ. Code § 3070, subd. (d)(1) and (2).) Thus, for example, each defendant contends there was no finding that its failure to comply with Vehicle Code section 22658 was intended to create or acquire such a lienhold interest. By contrast, Ramsey in essence contends such a finding was implicit. Specifically, he contends Advantage should be deemed to have acted in order to create or acquire such an interest because it admitted at trial (through the testimony of Elizarraras) that it acquires a lienhold interest "in every tow" it performs. And he contends Moore likewise should be deemed to have acted in order to create or acquire such an interest because "[i]t instigated the wrongful tows," "the natural result of [a] tow is the creation of a lienhold interest," and "the wrongful tows [in this case] resulted in a lienhold interest." But these arguments ignore the interrelationship among Vehicle Code section 22658 and Civil Code sections 3068.1 and 3070.

Pursuant to those sections, if a tow company tows a car from private property at the property owner's behest and in a way that complies with Vehicle Code section 22658, then by operation of section Civil Code 3068.1 it automatically acquires a lien. If the conduct of the property owner or tow

_____

[11]    We note that, in its statement of decision, the trial court made no factual findings in relation to section 3070 and did not articulate a rationale to support its application of that provision to the facts of this case. We note also that, in ruling on the motion for attorneys' fees, the court stated that there was no evidence to support a fee award under section 3070. (See *ante*.)

25

company is *not* in compliance with section 22658, then section 22658 may impose consequences on it in a variety of ways. (See e.g., § 22658, subds. (e)(1), (f), (j)(1), (k)(4), (*l*)(5), (m)(3).) And if one or the other (or both) of those parties not only comports itself in a way that fails to comply with section 22658, but does so "in order to create or acquire a lienhold interest enforceable under th[e] chapter" (Civ. Code § 3070, subd. (d)) of which sections 3068.1 and 3070 are a part, then subdivision (d) of section 3070 imposes *additional* consequences on it.

Here, Moore and Advantage were adjudged to have comported themselves in ways that were not in compliance with Vehicle Code section 22658. But the trial court did not find that they comported themselves in those ways "in order to create or acquire a lienhold interest." (Civ. Code § 3070, subd. (d).) (Indeed, in ruling on the fee motion, the court came to the opposite conclusion.) Moreover, it is not surprising that the trial court made no such finding. The record demonstrates: that Moore acted as it did, not in order to create or acquire a lienhold interest, but rather to render space number 8 available for use by a person or persons other than Ramsey; and that Advantage acted as *it* did, not in order to create or acquire such an interest, but to provide a service to Moore. That a lien might have resulted pursuant to section 3068.1 had the tow been properly authorized (see Civ. Code § 3068.1, subd. (a)(1)) does not trigger application of section 3070.

Hence the court erred in concluding that section 3070 is applicable to the circumstances presented in this case and, as a consequence, in awarding towing and storage fees pursuant to section 3070, subdivision (d).

**B.      Award of Four Times Towing and Storage Fees, Pursuant to Vehicle Code Section 22658, Subdivision (*l*)(5)**

The judgment awarded Ramsey $6,542.80, against Moore only, pursuant to section 22658, subdivision (*l*)(5).  (*See* Table 1 *ante*, line item B.) Moore contends this was error, and we agree.

As noted *ante*, subdivision (*l*)(1)(A) states that "[a] *towing company* shall not remove or commence the removal of a vehicle from private property without first obtaining . . . written authorization from the property owner or lessee . . . or an employee or agent thereof."  And subdivision (*l*)(5)  says "[a] person who violates this subdivision is civilly liable to the owner of the vehicle or their agent for four times the amount of the towing and storage charges."  (*Id.,* subd. (*l*)(5), italics added.)

The trial court in its statement of decision made determinations in favor of Moore but against Advantage with regard to subdivision (*l*)(1)(A). Specifically, it said:

> "The Court agrees with [Moore] that [Ramsey] failed to carry his burden that [Moore] did not comply with (*l*)(1)(A).
>
> "[¶ . . . ¶]
>
> "The Court agrees with [Ramsey] that [Advantage] did not comply with (*l*)(1)(A)."

But—notwithstanding these determinations and notwithstanding the fact that Moore was not accused of failing to comply with any part of subdivision (*l*) *other* than (*l*)(1)(A))—the court then proceeded to conclude that damages in the amount of four times the towing and storage charges, pursuant to subdivision (*l*)(5), were to be imposed on *Moore* rather than on Advantage:

> "[Ramsey] is awarded a civil penalty of four times the amount of the towing and storage charges or the amount of $6,542.80 against [Moore] only.  Vehicle Code [§] 22658(*l*)(5)."

27

In light of these determinations, Moore not surprisingly contends the trial court erred in imposing section (*l*)(5) damages on it. Moore is correct. By its terms, section (*l*)(1)(A) applies to towing companies, not to property owners. Indeed, Ramsey having failed to establish that Moore violated section (*l*), Moore cannot be assessed *damages* for a violation of that subdivision pursuant to section (*l*)(5).

Ramsey contends the $6,542.80 award against Moore should be upheld irrespective of the merits of Moore's challenge to it. In support of this contention, he argues (1) that Moore waived its ability to challenge this component of the judgment by not objecting to its presence in the proposed judgment and (he says) by instead "*advocat[ing] for it to be included* in the judgment" (italics added) and (2) that provisions other than subdivision (*l*) of section 22658 justify the $6,542.80 award. We are not persuaded.

With regard to the first of the two counterarguments, Ramsey correctly points out that the objection Moore filed in response to his proposed judgment did not protest the presence, in the proposed judgment, of the $6,542.80 statutory damages award. (See *ante*.) And he also correctly points out that, in that objection, Moore proposed alternative language that *included* the $6,542.80 award. (See *ante*.)

But these observations are misleading because, while Moore did not protest the $6,542.80 award in its objection to the *proposed judgment*, it did protest that award in its objection to the *statement of decision*—which the trial court overruled. (See *ante*.) Once its objection had been overruled at the statement-of-decision phase of proceedings, Moore was under no obligation to burden the court with a renewal of precisely the same objection at the ensuing judgment phase to avoid waiving or forfeiting its right to raise the matter on appeal.

As for Ramsey's second counterargument with respect to the $6,542.80 statutory damage award, we note that the alternative subdivisions for which he contends—subdivisions (e)(1) and (f) of Vehicle Code section 22658, and subdivision (d)(1) of Civil Code section 3070—are not the basis on which the court awarded those damages, and Ramsey has made no showing that he brought such an argument to the attention of the trial court between its issuance of the statement of decision and its issuance of the judgment. Consequently that argument is forfeited on appeal.

For these reasons, the trial court erred in awarding $6,542.80 against Moore pursuant to section 22658 subdivision (*l*)(5).

## C. Awards of Tort Damages

As noted *ante*, in addition to the statutory damages discussed above, the judgment awarded Ramsey two types of tort damages. Specifically, (1) it awarded him the sum of $1,635.70 and $6,000 against Moore, plus the same sum against Advantage, in *economic* tort damages to compensate him for the towing and storage fees he had paid to Advantage and for the value of his car, respectively; and (2) it awarded him the sum of $45,000 against Moore, plus the same sum against Advantage, in *noneconomic* tort damages to compensate him for emotional distress, inconvenience, anxiety, and humiliation. (*See* Table 1 *ante*, line item C.) Both Moore and Advantage challenge their respective liability in tort as well as the amount of the damages. Some of the contentions that the defendants raise in support of their challenges are unique to their respective situations, and some are common to both. We discuss below the arguments unique to each defendant and then turn to their common contentions.

1. **Challenges to the Determination of Tort Liability and Award of Tort Damages Unique to Moore**

In challenging the award of tort damages against it, Moore contends (i) that the trial court erred in determining that, at the time of the tows, Ramsey was entitled to park in the Moore Place parking lot; (ii) that the court further erred in imposing economic damages equal to the entire value of the car; and (iii) that Moore never exercised dominion or control over Ramsey's car and therefore could not be liable for conversion.

In support of its finding that Moore was liable for conversion, the trial court found that "[d]efendants substantially interfered with [Ramsey's] property by knowingly or intentionally taking possession of (or illegally towing) [Ramsey's] Smart car, at a time when [he] was entitled to park his car in his assigned parking space no. 8." The court further found that Ramsey did not consent to the towing.

Moore contends that these findings were not supported by substantial evidence. Whether or not substantial evidence supported the court's finding that Ramsey was entitled to park at Moore Place at the time of the tow, substantial evidence does support the finding that Moore illegally towed Ramsey's car. Specifically, the court found: that Moore's signage was inadequate, in violation of section 22658, subdivision (a)(1); that Moore did not provide Ramsey with sufficient notice of the first tow, as required by subdivision (a)(2); and that Moore did not notify law enforcement of either tow, as required by subdivisions (a)(3) and (f).

Liability for conversion requires an unwarranted interference with the plaintiff's dominion over property. (See *Henderson v. Security National Bank* (1977) 72 Cal.App.3d 764, 770 [" '[t]he foundation for the action of conversion . . . rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter

30

results' "].)  Here, although Ramsey's lease provided that, even for a vehicle for which an additional sum had been paid to park on the property, "[a] vehicle may be towed if it has . . . no current license sticker," Moore was nonetheless bound to comply with the requirements of the Vehicle Code.  In other words, nothing in the terms of the lease excused Moore from complying with the Vehicle Code. Because Moore violated the Vehicle Code in one or more respects as to each of the two tows, it cannot be said that its request to Advantage to tow Ramsey's vehicle was warranted.

Further, liability for conversion requires lack of consent.  (See CACI No. 2100 (2025 ed.) [absence of consent on the part of the plaintiff is a required element of conversion].)  Although the terms of the lease demonstrated that Ramsey had consented to the towing of his unlicensed car "if it . . . has . . . no current license sticker" and the evidence established that it did not have such a sticker, it cannot be said that Ramsey thereby agreed to tows that did not comply with statutory requirements.  Thus, the trial court's finding that Ramsey did not consent to the tow was not error.

Moore argues that because the trial court did not find that it violated section 22658 subdivision (a) during the second tow, it should not have been assessed damages for Ramsey's loss of his vehicle, which occurred after the second tow.  Moore maintains that its "only violation was the failure to provide the required 96-hour notice . . . before the First Tow."  But this assertion is contradicted by the statement of decision—which found, it would appear as to both tows, that Moore had violated subdivision (f) by failing to contact law enforcement as required.

These determinations also undercut Moore's argument that the trial court should not have imposed noneconomic damages, an argument that also focuses on the first tow.  We reject this argument for the same reason.

31

Moore's failures to comply with the Vehicle Code extended to both tows, as determined by the court.

Moore further contends that it never exercised dominion or control over Ramsey's car. We disagree. By contacting Advantage and arranging for it to tow Ramsey's car from Moore Place, Moore exerted " 'unwarranted interference . . . with the dominion over the property of the plaintiff from which injury to the latter results.' " (*Henderson v. Security National Bank* (1977) 72 Cal.App.3rd 764, 770–771 [bank that authorized an unlawful repossession was liable for conversion].) We do not read the law of conversion so narrowly that it imposes liability only on those who engage in the physical labor necessary to accomplish a tow.

The cases cited by Moore do not persuade us otherwise. (See *Jordan v. Talbot* (1961) 55 Cal.2d 597 [no indication that tenant was deprived of title to property that landlord arranged to have removed from her apartment and placed in storage under the tenant's name]; *Simonian v. Patterson* (1994) 27 Cal.App.4th 773 [rejecting as "utterly frivolous" claim of conversion that plaintiff leveled at his ex-fiance's father "for helping his daughter move record albums and Christmas decorations from her old apartment which she shared with plaintiff to her new apartment"].)

### 2. Challenges to the Determination of Tort Liability and Award of Tort Damages Unique to Advantage

Advantage contends that the trial court erred in determining that Advantage was liable in tort because:

– The court could not have found Advantage liable in tort had it not found the company failed to comply with a pre-tow requirement of section 22658;

32

- The only pre-tow requirement of section 22658 with which the court found Advantage had failed to comply was subdivision (*l*)(1)(A);[12] and

- "There was no evidence to support" a determination that the company had not complied with that subdivision.[13]

This argument is not persuasive, however, inasmuch as there in fact was evidence—*substantial* evidence within the meaning of the law (see *ante*)—that Advantage did not comply with subdivision (*l*). In this regard, subdivision (*l*)(1)(A) says "[a] towing company shall not remove or commence the removal of a vehicle from private property without first obtaining . . . written authorization from the property owner or lessee . . . , or an employee or agent thereof . . . ," and subdivision (*l*)(1)(B) says such written authorization "shall include":

"(ii) The name, signature, [and] job title . . . of the person, described in subparagraph (A), authorizing the removal of the vehicle[;]

"(iii) The grounds for the removal of the vehicle[;]

"(iv) The time when the vehicle was first observed parked at the private property[; and]

"(v) The time that authorization to tow the vehicle was given."

In addition, subdivision (*l*)(1)(A) further mandates that the property owner, lessor, employee, or agent providing the requisite written authorization must

---

[12]    Advantage contends the other compliance failures in which it was found to have engaged were merely "technical violations . . . in regard to post-tow events."

[13]    Advantage also asserts in a fragment of a sentence that the trial court's determination that Advantage failed to comply with subdivision (*l*)(1)(A) of section 22658 "is inconsistent with the findings as to Moore [Street]." But it fails to develop an argument to support this assertion.

33

not only verify the alleged violation, but also be present on the property at the time of the tow.

But the evidence adduced at trial supported an inference that Advantage did not comply with these requirements.  Specifically:  (1) the authorization form for the first tow did not include a signature or job title of the person authorizing removal of the car, nor did it include the grounds for removal; (2) the authorization forms for the second tow were undercut by the irregularities associated with them and by the absence at trial of any witness with personal knowledge of their provenance (e.g., the individuals who had signed them) or who could otherwise vouch for them; and (3) no witness was able to reliably confirm whether Mottola or any other Moore agent had been present on the property at the time of either tow.

Although Advantage cites testimony of Baker, Santana, and Elizarrara to the effect that Mottola authorized the tows on behalf of Moore, such testimony does not displace the substantial evidence (discussed *ante*) that the writings mandated by subdivisions (*l*)(1)(B)(ii)-(v) were defective and that no Moore agent was physically present during the tows.  (See *Bowers, supra,* 150 Cal.App.3d at p. 874 ["If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion."  (Italics omitted)].)

Thus we find no error in the determination that Advantage was liable in tort.

34

### 3. Common Challenges to the Determination of Tort Liability and Award of Tort Damages

#### a. The Contention that the Trial Court Erred in Awarding Emotional Distress Damages

Both Moore and Advantage contend that the trial court erred in awarding emotional distress damages. As to this challenge, Moore argues[14] that: (i) "[a]s a matter of law, Ramsey could not have suffered damage from the loss of use of his car because he had no legal right to drive his car"; (ii) Ramsey "made no showing that he suffered 'substantial and enduring' emotional distress after the First Tow"; (iii) "[t]here is no evidence of causation" because "Moore Street's failure to notify [Ramsey] 96 hours before the First Tow did not cause any emotional distress"; and (iv) "[e]ven if emotional distress damages are available, there is no basis for assessing the entire award, including for emotional [distress] . . . resulting from the loss of [Ramsey's] car after the Second Tow, against Moore Street."

Addressing each of these four arguments in turn, we begin with the first argument—which is that "Ramsey suffered no damage as a matter of law because he was not deprived of any legal right." This argument is based on the evidence that the registration for Ramsey's car was not current at the time of either tow and on an inference, based on that evidence, that this fact would have precluded Ramsey from being able to legally drive the car. But, irrespective of whether the car's registration status defeated Ramsey's ability to legally *drive* the car, the defendants' conduct—which led, first, to Ramsey being deprived of possession and, then, to his being deprived of title— interfered with his ability to do *other* things he was legally entitled to do with

---

[14] In support of this contention, Advantage does not make any independent arguments of his own. Instead it adopts four arguments that Moore has made in support of its challenge to such damages.

the car, such as, for example, retrieving the belongings he kept in it, performing repairs, or showing it to a prospective purchaser. Moreover, Ramsey's grievance in this case was not just that he had been deprived of the car, but, in addition, that he had had to endure a gauntlet of frustrating challenges as a result of the defendants' failures to comply with some of the obligations imposed by section 22658.

We note further in this regard that Advantage *acknowledges* it failed to comply with certain of the obligations imposed by section 22658. Thus, for example, Advantage says in its opening brief that:

> "Advantage does not dispute the findings of the Trial Court
> that Advantage did not comply with [subdivisions] . . .
> (*l*)(C)(iii) . . . (Notice to customer of law enforcement number)
> [or] (m)(1) of § 22658 . . . (Notify law enforcement.)"[15]

And it says in its reply brief that it "takes no issue with the findings that the evidence supported technical violations of some parts of Vehicle Code § 22658 in regard to post-tow events." But the requirements that are characterized as merely "technical" are requirements that the Legislature, presumably in an effort to deter predatory towing practices, has considered to be of sufficient importance to warrant imposition of some very clear and explicit rules—with which Moore and Advantage did not comply.

The second argument targeting the award of emotional distress damages is that Ramsey "fails to show any substantial and enduring

---

15    Advantage's brief also states that it does not dispute a trial court finding that it failed to comply with "[subdivision] (k)(1) . . . (valid bank credit card or cash for payment of towing)." However, the trial court actually found that "Plaintiff did not carry his burden that Defendant Advantage did not comply with (k)(1)-(2)."

36

emotional distress after the first tow."[16] To the contrary, Ramsey did adduce evidence of such distress. He did so through his testimony that dealing with the two tows "greatly affected" him and caused a loss of sleep, loss of appetite, elevated blood pressure, and stress.

Of course, Ramsey also testified to other challenges with which he was beset during the same general period of time in which he was having to contend with the repercussions of the tows (challenges pertaining to business setbacks, eviction proceedings, and his mother's health), and it certainly is possible that the symptoms he described might have been attributable in part to those other challenges. But the argument here is not that Ramsey's symptoms were insufficiently tethered to the repercussions of the tows, or that they were unallocated, over-valued, or inadequately supported. Rather, it is that they were not shown to be sufficiently enduring or substantial to warrant an award of noneconomic damages. Yet, our having not been present at trial to witness Ramsey's demeanor on the witness stand, we are in no position to conclude that the symptoms he described were too trivial and fleeting to warrant relief. Here, "the question before us is not whether we would have reached a different conclusion had we been the triers of fact. Rather, our review is confined to whether any substantial evidence supports

---

[16] In a related vein Moore and Advantage also argue that, "to the extent the [c]ourt's award is related to its conclusion that [Ramsey] suffered 'humiliation,' there is no evidence he suffered humiliation as a result of being deprived of his car after the [f]irst [t]ow." This argument suffers from two defects: First, inasmuch as we were not present in court to witness Ramsey's demeanor on the witness stand, we are in no position to assess whether humiliation was discernible in his testimony. (See *Newman v. Casey* (2024) 99 Cal.App.5th 359, 378 (*Newman*) [evaluation of a witness's demeanor and credibility is province of the trial court, not a court of review].) Second, the argument implicitly concedes that Ramsey may have suffered humiliation as a result of being deprived of his car after the *second* tow.

the trial court's findings, and in this regard it has often been said '[i]t is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility.' [Citation.] 'We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses.' [Citation.] We therefore must defer 'to the trier of fact on such determinations.' " (*Newman, supra,* 99 Cal.App.5th at p. 378.)

The third argument targeting the award of emotional distress damages is that any noneconomic damages Ramsey claims to have sustained as a result of the *first* tow could not have been proximately caused by Moore's failure to comply with the requirement, set forth in section 22658, subdivision (a)(2), that 96 hours' notice be provided before a tow." But as discussed *ante*, the liability of Moore and Advantage is predicated not just on the first tow but on *both* tows.

The fourth and final argument challenging emotional distress damages is Moore's argument that "[t]he evidence does not support an equal award of emotional distress damages against Moore and . . . Advantage." The thrust of this argument is that Advantage should be held to be comparatively more at fault than Moore. But this argument is forfeited inasmuch as it was not made in any of the objections the defendants filed in response to the statement of decision or the judgment.

Thus we find no error in the award of emotional distress damages as against Moore and Advantage.

### b. The Contention that the Award of Tort Damages Should Have Been Joint and Several

Moore and Advantage challenge the imposition of the awards for economic tort damages ($1,635.70 for towing and storage fees plus $6,000 for the value of the car) and noneconomic tort damages ($45,000) on them severally, instead of jointly and severally. So doing, they contend the

38

imposition of those awards severally, instead of jointly and severally, constituted an impermissible double recovery.  We agree.

The judgment stated in relevant part that Ramsey was awarded the towing and storage fees, the value of his car, and the emotional distress damages "against both Defendants;" and the judgment republished this language.  The use of the term "both" in the statement of decision and in the judgment created an ambiguity, because it did not make clear whether the court intended that the sums be awarded against each defendant individually (i.e., severally), or against the defendants jointly and severally.

This ambiguity was seemingly resolved by language at the end of the judgment that identified the total amount of damages awarded against Moore and the total amount of damages awarded against Advantage in amounts that could only have been derived by awarding the full amount of tort damages against Moore and the same amount, severally, against Advantage. (See Table 1.)  However, no justification for awarding such a double recovery was furnished by the trial court.  Nor is any such justification offered by Ramsey, or known to us.

Indeed, in this regard, the record before us demonstrates that there was no dispute that Ramsey had sustained damages totaling $1,635.70 in towing and storage fees, and that he valued his car at $6,000.  Neither the statement of decision nor the judgment suggested any other dollar value for either of these two line items.  Thus to require that these amounts be paid twice, i.e., once by Moore and once by Advantage, obviously would result in a tort recovery double the tort damages that Ramsey actually sustained—an outcome that the Legislature has expressly proscribed.  (Civ. Code § 1431

39

["[a]n obligation imposed upon several persons . . . is presumed to be joint . . . ;" exceptions inapplicable].[17])

Thus the judgment must be corrected to state that the $52,635.70 in damages are awarded jointly and severally.

**D. Attorneys' Fees**

The final issue before us pertains to the matter of attorneys' fees. As noted *ante*, the judgment awarded Ramsey attorneys' fees "pursuant to Civil Code [section] 3070" in an amount that was to be "determined in a post-trial motion." But, when the trial court ruled on the posttrial motion, it concluded that, on closer inspection, section 3070 did not support an award of such fees after all (the conclusion we arrive at in section II(A) *ante*); and, on this basis, it reversed course and denied the motion. Ramsey contends the court erred in denying an award of fees, and he offers two arguments in support of this contention. But we are persuaded by neither.

Ramsey's first argument is that, having determined in the judgment that Ramsey was entitled to an award of some amount of attorneys' fees, the court should not have revisited that determination in the proceedings that followed. In Ramsey's words:

> "It was an error of law to categorically deny Mr. Ramsey attorneys' fees. Because this issue regarding the entitlement to attorneys' fees was litigated and decided [in the judgment], Respondents should not have been allowed to challenge the ability to recover fees again."

---

[17]  A different provision of the Civil Code—section 1431.2—mandates that "the liability of each defendant for non-economic damages shall be several only and shall not be joint" in certain types of actions "based upon principles of comparative fault." But, as noted *ante*, any argument based on comparative fault was forfeited as a result of the defendants having failed to raise it below in the objections they filed in response to the statement of decision and the judgment.

40

But the law is to the contrary.  That is, "an order determining the entitlement to attorney's fees, but not the amount of the fee award, is interlocutory."  Moreover, "[t]his is true even if such an order is contained in what is otherwise an appealable judgment." (*P R Burke Corp. v. Victor Valley Wastewater Reclamation Authority* (2002) 98 Cal.App.4th 1047, 1055.) Consequently, the trial court did not err in revisiting the issue of an entitlement to attorneys' fees.

Ramsey's other argument is that the trial court erred in concluding that "the record does not support the ability to award attorney fees, pursuant to Civil Code section 3070(d)."  In support of this argument, Ramsey contends that  "[t]he plain language of Civil Code Sec. 3070(d)(1) makes attorneys' fees available to a prevailing plaintiff against 'any person who improperly causes a vehicle to be towed or removed in order to create or acquire a lienhold interest.' "  But, as discussed *ante*:  neither of the defendants was found to have acted as it did in order to create or acquire a lienhold interest, and section 3070 thus is inapplicable to the circumstances presented in this case.

Consequently, we find no error in the denial of Ramsey's motion for an award of attorney's fees.

### III.    DISPOSITION

The judgment is affirmed in part and reversed in part. The trial court is directed to amend the judgment so that it reflects a total award of $52,635.70 against Moore and Advantage, jointly and severally.  The order denying an award of attorneys' fees is affirmed.

41

Each party shall bear its own costs on appeal.

KELETY, J.

WE CONCUR:

DO, Acting P. J.

RUBIN, J.